IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

STERLING W. SPRINGS,

            Plaintiff,

v.

CAROLYN W. COLVIN,
Commissioner of Social Security,

            Defendant.

Case No.: 6:14-CV-01195-AC

OPINION AND ORDER

ACOSTA, Magistrate Judge:

    Sterling Springs ("plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. This Court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g). All parties have consented to allow a Magistrate Judge enter final orders and judgment in this case in accordance with Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). Based on a careful review of the record, the Commissioner's decision is affirmed and this case is dismissed.

Page 1 - OPINION AND ORDER

***Procedural Background***

Plaintiff applied for DIB on January 3, 2011, alleging disability as of January 27, 2010, due to abdominal migraines, degenerative disc disease, left knee injury, chronic right shoulder dislocation, anxiety, obsessive-compulsive disorder, and insomnia.[1] (Tr. 18, 166-68, 183.) His application was denied initially and upon reconsideration. (Tr. 123-31.) A hearing was held on August 14, 2012, before an Administrative Law Judge ("ALJ"). (Tr. 44-97.) On December 28, 2012, the ALJ issued a decision finding plaintiff not disabled. (Tr. 18-32.) Plaintiff timely requested review of the ALJ's decision and, after the Appeals Council denied his request for review, filed a complaint in this Court. (Tr. 1-6.)

***Factual Background***

Born on January 31, 1976, plaintiff was 33 years old on the alleged onset date of disability and 36 years old at the time of the hearing. (Tr. 49, 166.) He obtained his GED and worked previously as a prep cook, reforestation technician, and baker helper. (Tr. 31, 50, 88-89, 184.)

***Standard of Review***

The court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). Substantial evidence is "more than a mere scintilla. It means such relevant

---

[1] Although neither party addresses this issue and there is scant documentation thereof, plaintiff previously applied for, and was denied, DIB on May 14, 2010. (Tr. 179); *see also Epperson–Nordland v. Colvin*, Case No. 2:12-CV-01985-AA, 2013 WL 5774110, *3-4 (D. Or. Oct. 22, 2013) (explaining the process to reopen a prior claim or overcome the presumption of continuing disability where the claimant has successive applications). Additionally, the record before the Court constitutes nearly 700 pages, but with some incidences of duplication. Where evidence occurs in the record more than once, the Court will generally cite to the transcript pages on which that information first appears.

Page 2 - OPINION AND ORDER

evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation and internal quotations omitted). The court must weigh "both the evidence that supports and detracts from the [Commissioner's] conclusions." *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986). "Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's." *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007) (citation omitted).

The initial burden of proof rests upon the claimant to establish disability. *Howard v. Heckler*, 782 F.2d 1484, 1486 (9th Cir. 1986). To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Commissioner has established a five-step sequential process for determining whether a person is disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R.§ 404.1520. First, the Commissioner evaluates whether a claimant is engaged in "substantial gainful activity"; if so, the claimant is not disabled. *Yuckert*, 482 U.S. at 140; 20 C.F.R. § 404.1520(b).

At step two, the Commissioner resolves whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140-41; 20 C.F.R.§ 404.1520(c). If not, the claimant is not disabled. *Yuckert*, 482 U.S. at 141.

At step three, the Commissioner determines whether the claimant meets or equals "one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity." *Id.*; 20 C.F.R. § 404.1520(d). If so, the claimant is presumed disabled; if not, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

Page 3 - OPINION AND ORDER

At step four, the Commissioner considers whether the claimant can still perform "past relevant work." *Id.*; 20 C.F.R. § 404.1520(f). If the claimant can work, he is not disabled; if he cannot perform past relevant work, the burden shifts to the Commissioner. *Yuckert*, 482 U.S. at 141. At step five, the Commissioner must establish that the claimant can perform other work existing in significant numbers in the national or local economy. *Id.* at 142; 20 C.F.R. § 404.1520(g). If the Commissioner meets this burden, the claimant is not disabled. 20 C.F.R. § 404.1566.

### *The ALJ's Findings*

At step one of the five-step process outlined above, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date. (Tr. 20.) At step two, the ALJ determined that plaintiff had the following severe impairments: "attention deficit/hyperactivity disorder (ADHD); bipolar disorder II; generalized social phobia; alcohol dependence in current remission; opiate addiction in remission; history of left posterior cruciate ligament (PCL) tear/strain with degenerative joint disease; history of right shoulder instability status post Bankart reconstruction and possible impingement; cervical degenerative disc disease; sleep apnea; gastroesophageal reflux disease (GERD) vs. abdominal migraines; mild lumbar and thoracic scoliosis; and headaches." (Tr. 20-21.) At step three, the ALJ found that plaintiff's impairments, either singly or in combination, did not meet or equal the requirements of a listed impairment. (Tr. 22.)

As such, the ALJ continued the sequential evaluation process to determine how plaintiff's medical limitations affected his ability to work. The ALJ resolved that plaintiff had the residual functional capacity ("RFC") to perform medium work:

> with lifting and carrying of 50 pounds occasionally and 25 frequently. He can

> perform occasional overhead work with the left upper extremity and no overhead reaching with the right upper extremity. He can perform no squatting or stooping, or lifting from below waist level. He can understand, remember and carry out only simple instructions that can be learned in 30 days or less.

(Tr. 24.) At step four, the ALJ concluded that plaintiff could not perform his past relevant work. (Tr. 30.) At step five, the ALJ found, based on the testimony of a vocational expert ("VE"), that plaintiff could perform a significant number of light exertion, unskilled jobs existing in the national and local economy despite his impairments, such as bakery line worker, laminating machine operator, and dealer account representative. (Tr. 31-32.) Accordingly, the ALJ determined that plaintiff was not disabled within the meaning of the Act. (Tr. 32.)

## *Discussion*

Plaintiff argues that the ALJ erred by: (1) finding him not fully credible; (2) improperly assessing medical evidence from William Trueblood, Ph.D.; and (3) formulating an incomplete RFC, such that the step five finding was invalid. (Pl.'s Opening Br. 5-6.)

I. <u>Plaintiff's Credibility</u>

Plaintiff asserts that the ALJ failed to provide a specific, clear and convincing reason, supported by substantial evidence, for rejecting his subjective symptom testimony concerning the severity of his impairments. When a claimant has medically documented impairments that could reasonably be expected to produce some degree of the symptoms complained of, and the record contains no affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of . . . symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996) (citation omitted). A general assertion that the claimant is not credible is insufficient; the ALJ must "state which . . . testimony is not credible

Page 5 - OPINION AND ORDER

and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (citation omitted). If the "ALJ's credibility finding is supported by substantial evidence in the record, [the court] may not engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (citation omitted).

At the hearing, plaintiff testified that he is unable to work primarily as a result of his right shoulder impairment and abdominal migraines, which result in a limited range of motion and constant pain, nausea, and vomiting. (Tr. 58-61, 63-64.) He also endorsed shoulder dislocations multiple per daily, as well as extreme neck and knee pain, insomnia, headaches, numbness in his hands and feet, and anxiety. (Tr. 62, 65-73.) As for activities of daily living, plaintiff remarked that he "spend[s] most of the days trying to stretch [his] neck [and] back," but "really in the last few years [can] not [even do the stretching] that much." (Tr. 74.) Instead, he currently watches television, "pick[s] up some small clutter around the house," like clothes, and "maybe make[s] the bed with one arm" although it "takes . . . quite a while." (*Id.*) As for functional abilities, plaintiff stated that he can walk for "[m]aybe a couple of blocks" before needing to rest, and stand for four minutes and sit for "[m]aybe 20 minutes to half an hour" at one time. (Tr. 71-72.)

After summarizing his hearing testimony, the ALJ determined that plaintiff's medically determinable impairments reasonably could be expected to produce some degree of symptoms, but his statements regarding the extent of these symptoms were not fully credible due to his inconsistent reports and tendency to exaggerate, as well as the lack of corroborating medical evidence. (Tr. 25-30.)

Notably, the ALJ found that plaintiff's credibility was eroded by his contradictory statements. (*Id.*) Inconsistencies in a claimant's testimony or behavior can serve as a clear and convincing reason for an adverse credibility finding. *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005). The record is replete with evidence supporting the ALJ's finding, as plaintiff gave conflicting accounts concerning his functional abilities and activities of daily living, hospitalizations, alcohol use, etc. For instance, plaintiff stated in his January 2011 Adult Function Report that he "cannot function at all" on "bad days," which "are the majority," but may "eat, keep meds down [and] do a couple of chores" on "good days"; he estimated that he could walk for one-half mile before needing to rest. (Tr. 194-99.) In March 2011, plaintiff expressed to Michelle Whitehead, Ph.D., that he "rides a bike and walks" regularly – such that he "appear[ed] healthy and in good physical shape" – and played video games, watched television, used the internet, wrote stories, and did chores, like cleaning the litter box, vacuuming, and folding laundry, on a daily basis. (Tr. 529-30); *see also Molina v. Astrue*, 674 F.3d 1104, 1112-13 (9th Cir. 2012) (daily activities may be used to discredit a claimant where they are either "transferable to a work setting" or "contradict claims of a totally debilitating impairment") (citations omitted). He sat for one hour during that examination with "minimal" outward pain behavior. (Tr. 529.)

On top of "do[ing] a lot of cooking," he recited similar daily activities to Mike Henderson, M.D. (Tr. 533.) He also reported the ability to sit and stand for 60 minutes at one time, and walk for one-quarter of a mile before needing to rest. (*Id.*) In September 2011, he recounted to a different provider an "enjoyable" drive that he took from Bend to Salem "and back," a round-trip of approximately five hours; he also cooked and attended a wedding, despite undergoing treatment for an "aggressive [tooth] infection." (Tr. 644-45, 674.) In his August 2012 letter, submitted before the

Page 7 - OPINION AND ORDER

hearing, plaintiff indicated severe limitations on most days, such that he performed essentially no daily activities. (Tr. 248-49.) While he testified that he could sit for no more than 30 minutes at one time, plaintiff "remained seated for the 60 plus minute hearing." (Tr. 25-27, 46, 71-74. 97.) Less than two months later, during his return visit with Dr. Henderson, he endorsed the ability to sit for 15 minutes at one time but, upon examination, the doctor could "not find objective evidence to limit sitting, standing or walking." (Tr. 685.)

Regarding hospitalizations for his abdominal condition, plaintiff reported to one provider in August 2010 that he had "similar episodes of abdominal pain in 2004 [and] 2008." (Tr. 353.) In September 2010, he specified previous "[stomach] episodes in 2003 and 2007." (Tr. 433.) In March 2011, he explained to Dr. Henderson that he had only "been hospitalized 3 times in his lifetime for abdominal pain [but] is now going to the hospital 3 times per year." (Tr. 26, 532-33.) That same month, he communicated to Dr. Whitehead, while recounting his "'undiagnosed' stomach problems," that "[h]e has been hospitalized five times during the past two years and ten times to the emergency room." (Tr. 527.) During his subsequent exam with Dr. Henderson in October 2012, plaintiff disclosed that "he has been to the ER about 30 times and admitted to the hospital approximately 8 times in the last 10 years" for nausea and vomiting. (Tr. 26, 683.) Plaintiff's August 2012 letter specified that, in a "good month," he "throw[s] up a couple of times a day and a couple of times at night," and a "bad month is non stop vomiting for weeks on end," such that he "usually come[s] back to the E.R. every few days for another month then the cycle starts again." (Tr. 26, 248.) However, plaintiff "finally agreed at the hearing that his stomach condition had been better over the last year" – i.e. he has been "able to eat solid food" and only "throw[s] up here and there" – such that he had not presented to the emergency department since June 2011, when he was not

Page 8 - OPINION AND ORDER

admitted. (Tr. 26, 54, 66.) He nonetheless testified at that time that, up until June 2011, he "was going [to the emergency room] about every month, sometimes every week." (Tr. 53.) An independent review of the record reveals that plaintiff underwent two clusters of emergency treatments related to his stomach during the relevant time period, one in August/September 2010 and the other in December 2010. (Tr. 26, 353-62, 366, 368, 435-53, 466-73, 489-93, 535.)

Although he repeatedly told his providers that ceasing to drink improved his nausea, vomiting, and stomach pain, he did not significantly reduce his chronic alcohol consumption until at least the end of 2010 or beginning of 2011. (Tr. 26, 58, 76); *see also* (Tr. 433 (reporting in September 2010 that he "swore off all caffeine and alcohol" when "when his most recent abdominal syndrome and vomiting recurred," and "has been fine since"), 444 (indicating in December 2010 that he had resumed drinking until his last abdominal episode began), 447 (stating to another provider in December 2010 that he "only rarely drinks"), 500 (disclosing to yet another provider in December 2010 that he is a "[d]aily," "heavy alcohol drinker"), 529-31 (remarking in March 2011 he used to drink "heavily," "his last alcohol use was three days ago," and that he "craves to drink daily," such that Dr. Whitehead opined "[i]t is possible [plaintiff] drinks more than he is willing to report"), 534 (expressing to Dr. Henderson in March 2011 that he only has "2 drinks per week"), 645 (explaining in October 2011 that he felt an abdominal episode "coming on but 'no alcohol and rest seemed to alleviate'" his symptoms), 673 (specifying to Dr. Trueblood in September 2012 that his "[d]rinking was heavy from [ages] 19 to 34" – i.e. a "16 pack of beer on a daily basis or three quarters of a fifth of rum in a day" – but "[h]e currently only has one drink about every two weeks").) As the ALJ reasonably concluded, these inconsistencies belie plaintiff's subjective symptom statements.

The ALJ also determined plaintiff's tendency to exaggerate undermined his credibility. (Tr.

Page 9 - OPINION AND ORDER

26-28.) A tendency to exaggerate is a legitimate consideration in evaluating a claimant's credibility. *Tonapetyan v. Halter*, 242 F .3d 1144, 1148 (9th Cir. 2001). Numerous providers questioned plaintiff's effort on exams, noted "irregularities" between his behavior and test results, described him as "overly-dramatic," and/or observed that his complaints were "excessive." (Tr. 274, 429, 530, 532, 535, 568-69, 683, 685.)

In addition, the ALJ found that plaintiff's subjective complaints were not supported by the medical record. (Tr. 27-28.) "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001). Here, plaintiff's attestations of frequent migraine headaches and knee pain are unsupported by the record, as he received very little treatment during the adjudication period for these allegedly debilitating impairments. (Tr. 27, 62, 71, 83-83, 607-22, 648-54); *see also Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (ALJ may consider an unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment in assessing credibility). Further, plaintiff testified that he needed to "brea[k] off bone spurs" in his neck daily and was told that neck surgery would "kill [him] or paralyze [him] for life," yet the medical record does not contain any evidence to that effect. (Tr. 27, 62, 79-82.)

Plaintiff maintains that the ALJ "had the responsibility to develop the record in order to obtain such medical evidence" to support his subjective symptom statements (Pl.'s Opening Br. 27; Pl.'s Reply Br. 4, 7-11), but he misconstrues the law. A claimant bears the burden of proving the existence or extent of an impairment, such that the ALJ's limited "duty to further develop the record is triggered only when there is ambiguous evidence or when the record is inadequate to allow for

Page 10 - OPINION AND ORDER

proper evaluation." *Mayes v. Massanari*, 276 F.3d 453, 460 (9th Cir. 2001). In this case, plaintiff failed to furnish evidence substantiating the majority of his claimed limitations, despite the fact the ALJ noted these shortcomings and left the record open post-hearing to allow for supplementation. (Tr. 58-62, 64-70, 79-82, 95-96.)

That plaintiff neglected to carry his burden of proof, in part because he did not seek regular treatment for some of his allegedly disabling impairments, does not establish an ambiguity or inadequacy in the record, especially in light of the fact that the ALJ referred plaintiff to two additional consultive evaluations in order to generate additional medical evidence relating to severity. (Tr. 95-96.) Moreover, plaintiff's argument that the ALJ's decision was deficient because it lacked the requisite specificity is unfounded. As the foregoing discussion demonstrates, the ALJ did not arbitrarily discredit plaintiff's self-reports. Lastly, plaintiff's attempts to equate the ALJ's step two determination with a positive credibility finding are misplaced; it is well-settled that step two findings do not directly translate to the RFC, in large part because the "the step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen*, 80 F.3d at 1290.

Similarly, plaintiff offered sworn statements that he dislocates his right shoulder multiple times per day, such that he was prescribed a shoulder brace to wear at all times, but the medical record neither reflects that he was prescribed a brace on those terms nor shows any significant treatment for or limitation of that shoulder during the relevant time period. (Tr. 25, 27, 58-61, 371, 532-35, 604, 685.) In fact, although right shoulder surgery was recommended in July 2010, plaintiff elected not to go through with it, citing financial reasons. (Tr. 335-36.) Plaintiff's surgeon was "confused" over this choice - noting that a discounted payment plan had been offered which was "not financially out of reach for him" – especially because plaintiff "came in to the appointment today

Page 11 - OPINION AND ORDER

explaining that his life is 'ruined' because of his right shoulder" and the surgery "would help him dramatically." (Tr. 336.) While plaintiff offers an alternative reading of this evidence, the ALJ's interpretation was nonetheless rationale, such that it must be upheld. *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004).

Thus, the ALJ provided several specific, clear and convincing reasons, supported by substantial evidence, for rejecting plaintiff's subjective symptom statements. As a result, this Court need not discuss all of the reasons provided by the ALJ because at least one legally sufficient reason exists. *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162-63 (9th Cir. 2008). The ALJ's credibility finding is affirmed.

II.     Medical Opinion Evidence

Plaintiff also contends that the ALJ failed to provide a legally sufficient reason, supported by substantial evidence, for discrediting the medical opinion Dr. Trueblood.[2] There are three types of medical opinions: those from treating, examining, and non-examining doctors. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). To reject the uncontroverted opinion of a treating or examining doctor, the ALJ must present clear and convincing reasons. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (citation omitted). If a treating or examining doctor's opinion is contradicted by another doctor's opinion, it may be rejected by specific and legitimate reasons. *Id.*

In September 2012, Dr. Trueblood performed a one-time examination to assess plaintiff's mental functioning. (Tr. 670-78.) Dr. Trueblood's opinion was based on plaintiff's self-reports, a

---

[2] In the alternative, plaintiff argues that, if there was an "ambiguity or inconsistency between [Dr. Trueblood's opinion and the other medical evidence of record, her] responsibility was to recontact Dr. Trueblood for clarification." (Pl.'s Opening Br. 28.) For the reasons discussed herein, the ALJ's duty to more fully develop the record was not triggered.

cognitive screening, and the review of limited medical records. (Tr. 670.) The doctor diagnosed plaintiff with ADHD, bipolar disorder II, generalized social phobia, and alcohol dependence in full sustained remission. (Tr. 677.) He also listed "Cognitive Disorder NOS" as a provisional diagnosis and "schizotypal personality characteristics" as a rule out possibility. (*Id.*) Dr. Trueblood assigned plaintiff a global assessment of functioning ("GAF") score of 51,[3] classifying plaintiff's alleged physical problems, as well as his unemployment, "mild social isolation," and financial stress, as contributing factors. (*Id.*) In the narrative section of his evaluation, Dr. Trueblood denoted the following conclusions:

> This gentleman reports having attention problems back to childhood, with these worsening over the last 10 years. He reports memory problems since his late teens but these have been worse in the last 10 years. Cognitive screening results involve normal performance on a memory screening task. There is suggestive evidence for working memory impairment in terms of mildly impaired calculations and mildly low digit repetition, while mental tracking performance is rated as normal. Overall tentative impression is of acquired cognitive impairment in the milder range. I cannot rule out that it might be greater than that. This gentleman's history that involves a number of very plausible contributing factors to acquired cognitive or neuropsychological impairment does lead me to believe that there likely is at least some such impairment. History includes repeated head injuries (involvement in mixed martial arts for a number of years), very long-term benzodiazepine use, past alcohol abuse, bipolar disorder, and ADHD . . .
>
> Information that is relevant in rating [plaintiff's] ability to understand and remember instructions includes that there was just one instance when [he] had any difficulty

---

[3] To the extent he contends his GAF score, alone, establishes his entitlement to benefits, plaintiff's argument is unpersuasive. A GAF of 51 to 60 merely equates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000); *see also Skelton v. Comm'r of Soc. Sec.*, Case No. 6:13-CV-01117-HZ, 2014 WL 4162536, *11 (D. Or. Aug. 18, 2014) (explaining that the fifth and most recent edition of the Diagnostic and Statistical Manual of Mental Disorders abandoned the GAF scale for several reasons, including "its lack of conceptual clarity" and "questionable psychometrics in routine practice") (citation and internal quotations omitted).

Page 13 - OPINION AND ORDER

> understanding something that I said to him[.] Overall tentative impression is that impairment in ability to remember instructions is probably mild to moderate or less. Again, though, it certainly is possible that the impairment is greater than that, especially in view of the number of plausible contributing factors in this gentleman's history[.] Regarding [plaintiff's] ability to sustain attention/concentration and persist, his presentation on this evaluation did involve tangential speech that was of a degree and nature that leads me to believe that it probably is based in an underlying attention disturbance. [I] suspect that there is significant impairment in this gentleman's ability to sustain attention/concentration and persist [but it is important to mention] that the history of holding jobs for long spans of time is some evidence for good persistence and sustaining attention. Regarding [plaintiff's] ability to engage in appropriate social interaction, he has some long-term friendships. He has limited but some social contact. He does have significant temper problems and these seem to be at a level such that he is susceptible to having incidents of loss of temper towards strangers in public settings. There is significant interpersonal anxiety and avoidance. This gentleman's history of holding jobs for long spans of time is a piece of evidence in favor of his ability to get along with others.

(Tr. 675-77.)

On an accompanying Medical Source Statement, Dr. Trueblood checked boxes reflecting that plaintiff was: not limited in his ability to make judgments on simple work-related decisions and to understand, remember, and carry out simple instructions; mildly limited in his ability to interact appropriately with co-workers; moderately limited in his ability to respond appropriately to usual work situations, make judgments on complex work-related decisions, and understand, remember, and carry out complex instructions; and markedly limited in his ability to interact appropriately with the public and supervisors.[4] (Tr. 680-81.) In regard to the latter restriction, Dr. Trueblood explained "[it is a] close call as to whether to rate interacting with the public and supervisors as marked or moderate, but the combination of temper problems and anxiety seem to warrant [the] marked rating."

---

[4] This form defined "moderate" as "more than a slight limitation in this area but the individual is still able to function satisfactorily" and "marked" as less than "extreme" - i.e. "[t]here is serious limitation in this area [and] a substantial loss in the ability to effectively function." (Tr. 680.)

Page 14 - OPINION AND ORDER

(Tr. 681.)

The ALJ accepted the majority of Dr. Trueblood's opinion and therefore limited plaintiff to work involving "only simple instructions that can be learned in 30 days or less." (Tr. 24, 30.) However, on the narrow issue of the plaintiff's social functioning, the ALJ gave Dr. Trueblood's assessment "limited weight" because: (1) his formulation of plaintiff's anxiety was "ill-defined"; (2) plaintiff "did not allege the same socially based issues to Dr. Whitehead previously"; and (3) there is "little" in the record to support such limitations, as plaintiff's own remarks indicate that "job losses have been due to physical problems" and he "denied ever losing a job due to problems getting along with others." (Tr. 30.)

Initially, an ALJ is not required to accept medical limitations phrased equivocally. *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 691-92 (9th Cir. 2009). An ALJ may also discredit a medical opinion that is "conclusory, brief, and unsupported by the record as a whole [or] by objective medical findings." *Batson*, 359 F.3d at 1195 (citation omitted). Moreover, an ALJ can satisfy the "substantial evidence" requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (citation omitted).

Here, the ALJ did not err to the extent she afforded less weight to Dr. Trueblood's opinion. As both the narrative portion of his assessment and his check-the-box explanation demonstrate, Dr. Trueblood's discussions of plaintiff's social limitations were phrased in noncommital terms. He recorded plaintiff's temper problems, which were not independently observed, and anxiety, but he also noted plaintiff's history of long-term friendships, limited but nonetheless existent social contact, and ability to hold jobs for long periods of time with no interpersonal issues. (Tr. 671-77.) In other

Page 15 - OPINION AND ORDER

words, as Dr. Trueblood resolved on the check-the-box form, the extent of plaintiff's social impairment was unclear and he gave plaintiff the benefit of the doubt due to plaintiff's self-reports. (Tr. 681.) Accordingly, it was reasonable for the ALJ to construe Dr. Trueblood's vaguely-defined social restrictions as "not represent[ing] work-related limitations of function that need to be reflected in the RFC." *Griffith v. Colvin*, Case No. 3:13-CV-00585-HZ, 2014 WL 1303102, *5 n.3 (D. Or. Mar. 30, 2014); *see also Glosenger v. Comm'r of Soc. Sec. Admin.*, Case No. 3:12-CV-1774-ST, 2014 WL 1513995, *6 (D. Or. Apr. 16, 2014) (affirming the ALJ's rejection of functional restrictions because the doctor used "equivocal language ('might do better' and 'would also likely require')").

Further, an independent review of the record evinces that plaintiff has no significant issues getting along with others. *See, e.g.*, (Tr. 56, 77-78, 200, 248-50, 428-30, 527-30, 617-18, 643-46, 648-49, 652.) Namely, plaintiff did not disclose psychological symptoms at the hearing, despite being provided an ample opportunity to do so, or in his August 2012 letter; in his January 2011 Adult Function Report, he expressly denied ever being "fired or laid off from a job because of problems getting along with other people" and stated that he got along "okay" with "authority figures [such as] bosses." (Tr. 49-87, 95, 200, 248-49.) Plaintiff's statements to Dr. Trueblood distinctly diverged from those furnished to Dr. Whitehead in that he did not endorse having extreme anger and anxiety problems, or a "very hard time being out in public," to Dr. Whitehead. (Tr. 527-31, 671-74.) As such, neither Dr. Whitehead nor the state agency consulting sources found restrictions in social functioning. (Tr. 103, 115-16, 531.) In fact, as the ALJ noted, plaintiff was still receiving unemployment benefits at the time of Dr. Whitehead's March 2011 assessment, meaning that he was publicly holding himself out as capable of working. (Tr. 29, 429, 529); *see also Ghanim v. Colvin*,

Page 16 - OPINION AND ORDER

763 F.3d 1154, 1165 (9th Cir. 2014) ("receipt of unemployment benefits does cast doubt on a claim of disability") (citation omitted). Regardless, as Dr. Trueblood acknowledged, plaintiff's self-reports did not indicate any problems with authority figures and revealed that he is capable of engaging in long-term romantic, platonic, and professional relationships. (Tr. 671-77.) For example, he recounted living a relatively harmoniously life with his wife, whom he had been married to for several years, "visiting occasionally with a neighbor," and "having contact in person every two weeks with one of his close friends." (*Id.*) He also told Dr. Trueblood that he has only been fired twice, once for "goofing off" and the other time for physical reasons. (Tr. 673-74.) The foregoing lends additional support to the ALJ's finding that plaintiff was not markedly limited in his ability to interact appropriately with supervisors and the public.

Even assuming, that the ALJ erred in rejecting Dr. Trueblood's social limitations, such an error was harmless. *See Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006) (mistakes that are "nonprejudicial to the claimant or irrelevant to the ALJ's ultimate disability conclusion" are harmless). The representative occupations identified by the VE are all unskilled, meaning that they "involve dealing primarily with objects, rather than with data or people." (Tr. 90-91); SSR 85-15, *available at* 1985 WL 56857; 20 C.F.R. § 404.1568(a). As a result, in performing these positions, plaintiff would not be required to come into contact with the public or to coordinate closely with a supervisor. *See McCown v. Colvin*, Case No. 6:13-CV-01716-AA, 2015 WL 106056, *6 (D. Or. Jan. 6, 2015) (affirming the ALJ's decision under analogous circumstances).

In sum, the ALJ provided a detailed and thorough summary of the record, and reasonably found, based on this evidence, including plaintiff's own prior accounts, that there was no basis for a social restriction in the RFC. (Tr. 21-30.) The ALJ's assessment of Dr. Trueblood's opinion is

Page 17 - OPINION AND ORDER

affirmed.

III. <u>RFC and Step Five Finding</u>

Finally, plaintiff argues that the ALJ's RFC and step five finding are erroneous because they did not account for all of the limitations set forth in his testimony and the opinion of Dr. Trueblood. Although not elaborated upon in great detail or explicitly laid out as part of his RFC/step five challenge, plaintiff also asserts that "[t]he ALJ did not properly consider the combined effect of [his] multiple impairments, severe and non-severe."[5] Pl.'s Opening Br. 6.

The RFC is the maximum a claimant can do despite his limitations. 20 CFR § 404.1545. In determining the RFC, the ALJ must consider limitations imposed by all of a claimant's impairments, even those that are not severe, and evaluate "all of the relevant medical and other evidence," including the claimant's testimony. SSR 96–8p, *available at* 1996 WL 374184. Only limitations supported by substantial evidence must be incorporated into the RFC and, by extension, the dispositive hypothetical question posed to the VE. *Osenbrock v. Apfel*, 240 F3d 1157, 1163-65 (9th Cir. 2001).

As addressed herein, the ALJ properly discredited plaintiff and Dr. Trueblood, and there is no indication, outside of this evidence, that plaintiff suffered from functional limitations beyond those outlined in the RFC during the relevant time period. In fact, no medical source opined that he is disabled or otherwise unable to work. Furthermore, the record controverts plaintiff's assertion that the ALJ failed to consider the combined effect of his mental and physical impairments, both severe and non-severe. (Tr. 21-30.) Therefore, plaintiff's arguments, which are contingent upon a finding

---

[5] Plaintiff's reply brief implies that this argument is simply a different iteration of his RFC and step five challenge. *See, e.g.*, (Pl.'s Reply Br. 14.) Nevertheless, in order to provide the most complete review of this appeal, the Court treats this issue separately.

Page 18 - OPINION AND ORDER

of harmful error in regard to the aforementioned issues, are without merit. *Bayliss*, 427 F3d at 1217-18; *Stubbs-Danielson v. Astrue*, 539 F3d 1169, 1175-76 (9th Cir. 2008). The ALJ's RFC and step five finding are upheld.

### *Conclusion*

For the reasons stated above, the Commissioner's decision is AFFIRMED and this case is DISMISSED.

IT IS SO ORDERED.

DATED this 8th day of February 2016.

JOHN V. ACOSTA
United States Magistrate Judge